## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---

**DIGITALDOORS, INC.,**

                Plaintiff,

      v.

**FLUSHING BANK,**

                Defendant.

**Case No. 1:25-cv-1895**

---

## DECLARATION

Jean-Marc Zimmerman hereby declares:

1.      I am counsel for Plaintiff DigitalDoors, Inc. ("Plaintiff") and submit this Declaration in support of Plaintiff's Motion to Vacate and Alter the Order dated January 16, 2026 (D.E. 29) pursuant to Fed. R. Civ. P. ("Rule") 58 and 60(b)(1), respectively, and for Leave to File a Second Amended Complaint pursuant to Rule 15(a)(2).

2.      A true and correct copy of a letter dated November 11, 2025, that I previously submitted to Court as D.E. 26 is attached hereto as Exhibit 1.

3.      A Proposed Second Amended Complaint is attached hereto as Exhibit 2.

4.      I declare under the laws of the United States that the foregoing is true and correct.

By: */s/ Jean-Marc Zimmerman*
       Jean-Marc Zimmerman

Dated: February 1, 2026
      Woodbridge, NJ

# EXHIBIT 1



LUCOSKY BROOKMAN LLP

101 Wood Avenue South
5th Floor
Woodbridge, NJ 08830

T – (732) 395-4400
F – (732) 395-4401

111 Broadway
8th Floor
New York, NY 10006

T – (212) 332-8160
F – (212) 332-8161

www.lucbro.com

November 11, 2025

Via ECF
Hon. Sanket J. Bulsara, U.S.D.J.
United States District Court
Eastern District of New York
100 Federal Plaza, Courtroom 930
Central Islip, New York 11722

Re:    *DigitalDoors, Inc. v. Flushing Bank*
       Case No. 1:25-cv-1895-SJB-SIL

Dear Judge Bulsara:

Plaintiff DigitialDoors, Inc. ("Plaintiff") submits this letter to correct the implication made in its Response (ECF No. 22) to Defendant Flushing Bank's ("Defendant") Motion to Dismiss (ECF No. 21) that Defendant uses Sheltered Harbor Certified software provided by Q2 Software Inc. ("the Q2 Software") to infringe the claims of the patents-in-suit. See Plaintiff's Response (ECF No. 22), page 2, second full paragraph.

More specifically, Defendant's counsel Barry Bumgardner (who is also counsel to Q2) recently advised Plaintiff that while the Q2 Software provided to Defendant is Sheltered Harbor certified, it is not used for operations covered by claims of the patents in suit. After investigating the matter, Plaintiff accepts Mr. Bumgardner's assertion as being accurate and consequently no longer asserts that Defendant's use of the Q2 Software infringes the patents-in-suit. However, Plaintiff still believes and continues to allege that Defendant's actions using other software in backing up core bank data to comply with certain federal bank regulations infringes the patents-in-suit, and it will therefore continue to litigate this case.

Respectfully,

LUCOSKY BROOKMAN LLP
By: */s/ Jean-Marc Zimmerman*
Name: Jean-Marc Zimmerman
Title: Partner
E: jmzimmerman@lucbro.com
T: (908) 768-6408

cc: Counsel for Defendants

EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **DIGITALDOORS, INC.,** | |
| Plaintiff, | **Case No. 1:25-cv-1895** |
| v. | **JURY TRIAL DEMANDED** |
| **FLUSHING BANK,** | |
| Defendant. | |

**SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT**

DigitalDoors, Inc. ("DigitalDoors" or "Plaintiff") hereby files this Complaint for Patent Infringement against Flushing Financial Corp. d/b/a Flushing Bank ("Flushing" or "Defendant"), and alleges, upon information and belief, as follows:

**INTRODUCTION**

1.    DigitalDoors was established in 2001 to develop data security solutions for survivability and continuity of operations of the U.S. Government, including military and intelligence agencies, in the event of a catastrophic event such as a cyberattack or a natural disaster.

2.    These solutions were directed toward systems and methods to securely backup and reassemble sensitive data on a computer network by identifying, dispersing and reassembling such data to ensure the resiliency and survivability of the network and its data.

3.    These solutions were first described by way of various embodiments in DigitalDoors' Provisional Applications filed in the United States in 2006 and 2007 that eventually resulted in the issuance of numerous U.S. Patents including the four following ones in suit in this case: (i) 9,015,301 ("the '301 Patent" attached hereto as Exhibit 1); (ii) 9,734,169 ("the '169 Patent" attached hereto as Exhibit 2); (iii) 10,182,073 ("the '073 Patent" attached hereto as Exhibit 3); and (iv) 10,250,639 ("the

1

'639 Patent" attached hereto as Exhibit 4) (hereinafter collectively as "the DigitalDoors Patents"), each having a priority date of at least as early as January 5, 2007.

4.      Federal banking regulations and industry standards, promulgated in direct response to the catastrophic failure of conventional security architectures during the U.S. Treasury's "Hamilton Series" simulations, have compelled the U.S. financial services industry to converge upon the specific systems and methods claimed in the DigitalDoors Patents. These regulations, including the Gramm-Leach-Bliley Act (GLBA) and the FFIEC Cybersecurity Resource Guide, now effectively mandate the use of "data vaulting," "air-gapped isolation," and "granular content extraction", the precise technological innovations pioneered and patented by DigitalDoors nearly a decade prior to their industry-wide adoption.

5.      These regulations and guidelines have been promulgated in response to the enactment in 1999 of the Gramm-Leach-Bliley Act ("GLBA") also known as the Financial Services Modernization Act of 1999 (Pub. L. 106-102, 113 Stat. 1338).

6.      To comply with these data backup and disaster recovery system regulations and standards, Defendant utilizes software and hardware that infringe the DigitalDoors Patents.

7.      Regulation-compliant data backup and disaster recovery systems are offered by numerous vendors including, but not limited to, CMIT Solutions, Redpoint Cybersecurity, Fidelity Information Services, Jack Henry & Associates, Inc., 21CS, Cobalt Iron, and Cohesity, Inc..

8.      Many U.S. financial institutions participate voluntarily in industry frameworks such as the Sheltered Harbor Data Vaulting Initiative ("Sheltered Harbor"), an exemplary implementation that has become a widely-used standard in meeting data security requirements compelled by federal law.

9.      Adherence to and participation in Sheltered Harbor is not required for infringement of the DigitalDoors Patents.

10.

## THE PARTIES

11.    DigitalDoors, Inc. is a corporation organized and existing under the laws of the State of Florida with its principal place of business at 4201 Collins Avenue, Suite 2103, Miami Beach, Florida 33140.

12.    Defendant is a State-chartered bank, with a principal place of business located at 260e Rxr Plaza, Uniondale, NY 11556, and specifically targets customers in the State of New York and in this judicial District.

13.    Flushing executive leadership has explicitly engaged in public discourse identifying their system of record as the "FIS Miser core processing system." This admission was made in the context of integrating commercial lending automation software, a process that requires precise technical identification of the host system. Flushing selects Vanguard Software Group's LoanVantage product, accessed January 27, 2026, https://www.banking-gateway.com/news/flushing-bank-selects-vanguard-software-groups-loanvantage-product-150416-4866212/

14.    Flushing continues to recruit operational staff specifically for their ability to navigate the "Miser/PCFS" environment. Current job descriptions for "Loan Servicing Administrator" roles mandate the manual input and extraction of data from these legacy systems, confirming that Miser remains the active system of record as of the current fiscal period. Flushing selects Vanguard Software Group's LoanVantage product, accessed January 27, 2026, https://www.banking-gateway.com/news/flushing-bank-selects-vanguard-software-groups-loanvantage-product-150416-4866212/

15.    Fidelity Information Systems Inc. (FIS) provides Miser, which is a bank core system, that holds the authentic record for deposit accounts, general ledger accounting, and regulatory reporting.

16.    Defendant's core banking operations rely on the FIS Miser core processing system, a legacy platform optimized for thrift institutions. To modernize this legacy core and enable digital

3

capabilities, Defendant has implemented a "wrapper" architecture utilizing third-party middleware and extraction tools including Vanguard Software Group's LoanVantage, MANTL, and Q2. These systems function by extracting specific data from the core, filtering it based on content and context, and storing it in segmented, functional data stores, thereby practicing the claimed inventions.

17.     Upon information and belief, and specifically regarding the security and resiliency of its workforce operations, Defendant utilizes VMware Horizon or a substantially similar Virtual Desktop Infrastructure (VDI) solution. As publicly touted by Defendant's executives, this system secures data by decoupling the user environment from the endpoint device, reconstructing the desktop experience from granular components stored in the data center only upon successful authentication.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338.

19.     This Court has personal jurisdiction over Defendant who has continuous and systematic business contacts with the State of New York, and in this District where it directly conducts business by selling and advertising its financial services including checking and savings accounts, payment cards, and secured or unsecured loans, to businesses and individuals.

20.     On information and belief, Flushing maintains industry standard data backup and disaster recovery systems to comply with various federal regulations.

21.     Venue is proper in the Eastern District of New York as to Defendant pursuant to at least 28 U.S.C. § 1400(b).  As noted above, Defendant maintains a regular and established business presence in this District, and specifically targets customers located within this District.

## THE DIGITALDOORS PATENTS

22.     Plaintiff is the sole and exclusive owner, by assignment, of the '301 Patent, the '169 Patent, the '073 Patent, and the '639 Patent, that each have a priority date of at least as early as January 5, 2007 ("the Date of Invention").

23.     The DigitalDoors Patents were originally issued and exclusively vested to the named joint inventors, Ron M. Redlich and Martin A. Nemzow, as of their respective dates of issuance. *See* 35 U.S.C. § 261; *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1072 (Fed. Cir. 2020).

24.     By way of written instruments, Messrs. Redlich and Nemzow each assigned all rights, title, and interest in the DigitalDoors Patents to DigitalDoors, Inc.  *See* Assignment dated May 5, 2007, as filed with the United States Patent and Trademark Office on June 7, 2007 at Reel 019396 and Frames 0728-0732 ('301 Patent); *see also* Assignment dated May 27, 2009, as filed with the United States Patent and Trademark Office on May 23, 2013 at Reel 030473 and Frames 0686-0690 ('169 Patent); *see also* Assignment dated May 5, 2007, as filed with the United States Patent and Trademark Office on June 1, 2021 at Reel 056402 and Frames 0740-0744 ('073 Patent, and '639 Patent).

25.     As such, Plaintiff DigitalDoors has sole and exclusive standing to assert the DigitalDoors Patents and to bring these causes of action for infringement and damages.

26.     The DigitalDoors Patents are each valid, enforceable, and were each duly issued in full compliance with Title 35 of the United States Code.

27.     Joint inventor Ron M. Redlich is a combat veteran of the Israeli Defense Forces who during the Yom Kippur War in 1973 fought in an Anti-Aircraft Missile Battery in the Sinai that was incapacitated by Soviet electronic warfare systems deployed by the Egyptian military.

28.    Following the war, Mr. Redlich became determined to develop resilient technological solutions for computer networks to survive systemic failures. Eventually, the efforts of Mr. Redlich came to fruition in the form of the inventions described and claimed in the DigitalDoors Patents.

29.    The DigitalDoors Patents are directed to the semantic disassembly and controlled reassembly of bank data using among other novel features: selectively configurable, hierarchical filtering of data based on different content criteria; classification and extraction of select data into discrete groups; data vaulting allocation of those fragmented groups to multiple physically and logically isolated storage repositories; maintenance of reconstruction metadata decoupled from the stored data; and controlled reassembly using metadata-driven logic.

PROSECUTION HISTORY

30.    The DigitalDoors Patents were examined by a multitude of United States Patent Examiners, including: Ranodhi Serrao ('301 Patent); Farrukh Hussain ('301 Patent); David Lazaro ('169 Patent); S.M.A. Rahman ('073 Patent and '639 Patent).  During the examination of the DigitalDoors Patents, the United States Patent Examiners searched for prior art in the following US Classifications: 706/59; 707/4; 707/206; 707/609; 707/777; 709/201; 709/203; 709/204; 709/206; 709/217; 709/223; 709/225; 709/226; 707/302; 713/166; 715/748; 726/13; 726/22; 726/23; 726/24; and 726/26.

31.    After giving full and proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiners each allowed all of the claims of the DigitalDoors Patents to issue.  In so doing, it is presumed that Examiners Serrao, Hussain, Lazaro, and Rahman used their knowledge of the art when examining the claims. *K/S Himpp v. Hear-Wear Techs., LLC*, 751 F.3d 1362, 1369 (Fed. Cir. 2014).

32.    It is further presumed that Examiners Serrao, Hussain, Lazaro, and Rahman each had experience in the field of the invention, and that the Examiners properly acted in accordance with a person of ordinary skill.  In re Sang Su Lee, 277 F.3d 1338, 1345 (Fed. Cir. 2002).

33.    In view of the foregoing, the claims of the DigitalDoors Patents are presumed novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.

34.    Likewise, the claims of the DigitalDoors Patents are presumed novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiners Serrao, Hussain, Lazaro, and Rahman.

35.    The DigitalDoors Patents are pioneering patents, and have been cited as relevant prior art in hundreds of subsequent United States Patent Applications, including Applications assigned to such technology leaders as Apple, Xerox, Yahoo!, Raytheon, IBM, Mitsubishi, Blackberry, Microsoft, Dropbox, Oracle, Fujitsu, NEC Corp., Ricoh, Verifone, Google, Sonos, Symantec, Juniper Networks, PriceWaterhouse Coopers, Sony, Amazon, Intuit, Uniloc, Qualcomm, Nokia, Hitachi, Honeywell, Hewlett-Packard, Northrop Grumman, Adobe, State Farm, Facebook, Disney, General Electric, Intel Corp., Siemens, KPMG, Cisco, Equifax, Kyocera, Motorola, Allstate, and Lenovo, in addition to financial services leaders including Wells Fargo, Bank or America, JPMorgan Chase, Capital One, and PayPal.

36.    The claims of the DigitalDoors Patents were all properly issued, and are valid and enforceable for the respective terms of their statutory life through expiration, and are enforceable for purposes of seeking damages for past infringement even post-expiration.  *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.*, 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.'  Much to the contrary, a patent does have value beyond its

expiration date.  For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286") (internal citations omitted).

37.    The nominal expiration date for the claims of the DigitalDoors Patents is no earlier than the year 2028, and as late as the year 2030.

38.    The DigitalDoors Patents are directed to improvements in the conventional systems used to secure data and computer networks existing as of the Date of the Invention that alter the operation of such networks including memory utilization, storage topology, and recovery execution paths, and are not directed to abstract business practices or regulatory concepts.

39.    The DigitalDoors Patents restructure how computers store, isolate, and recover data, yielding improvements in performance, security, and resilience unattainable by conventional systems.

## THE DIGITALDOORS PATENTS ARE NOVEL AND NON-OBVIOUS

40.    The DigitalDoors Patents includes numerous claims defining distinct inventions, and no single claim is representative (for purposes of infringement or validity) of the others.

41.    By way of example, Claim 25 of the '301 Patent recites such steps as "associating at least one data process from a group of data processes," "applying the associated data process to a further data input," and multiple options for "activation" of such filters.  In contrast, none of Claim 1 of the '169 Patent, Claim 1 of the '073 Patent, or Claim 16 of the '639 Patent include such limitations.

42.    Further, Claim 1 of the '169 Patent recites the "parsing" and "storing" of "remainder data," whereas Claim 25 of the '301 Patent does not, nor does Claim 1 of the '073 Patent.

43.    Still further, Claim 1 of the '073 Patent recites "altering" and "modifying" initially-configured filters, whereas none of Claim 25 of the '301 Patent, Claim 1 of the '169 Patent, or Claim 16 of the '639 Patent include such limitations.

44.    Yet still further, Claim 16 of the '639 Patent recites "inferencing" of content data, whereas none of Claim 25 of the '301 Patent, Claim 1 of the '169 Patent, or Claim 1 of the '073 Patent include such limitations.

45.    The important distinctions recited in paragraphs 25-28 are merely representative, as even a cursory review of the claims of the DigitalDoors Patents reveals numerous patentably distinct elements which preclude any single claims from being viewed as representative.

46.    As of the January 5, 2007 Date of Invention, and for at least the reasons set forth herein, the inventions as claimed in the DigitalDoors Patents were novel and non-obvious.

## SECONDARY INDICIA OF NON-OBVIOUSNESS

### A. LONG-FELT BUT UNSOLVED NEEDS

47.    The inventions claimed in the DigitalDoors Patents satisfied a long-felt but unsolved need in the cybersecurity and financial services industries for a data resilience architecture capable of surviving catastrophic, destructive cyberattacks.

48.    As of the January 5, 2007 Date of Invention, the financial sector relied heavily on "perimeter defense" strategies (firewalls, intrusion detection) and traditional disaster recovery methods (tape backups, synchronous disk mirroring). These conventional methods focused on restoring operations after hardware failures or natural disasters but were fundamentally inadequate against targeted "wiper" attacks or ransomware designed to destroy both production data and connected backups simultaneously. See "The Death of Tape Backup," StorageSearch.com (2007) (describing the industry's focus on online availability over isolation).

49.    The need for such a solution existed since at least the terror attacks of September 11, 2001, which exposed the fragility of centralized financial data. However, for nearly a decade after the Priority Date, the industry failed to address the specific vulnerability of backup corruption, leaving the U.S.

financial system exposed to systemic collapse. The DigitalDoors Patents solved this need by introducing an architecture of semantic disassembly and granular, isolated data vaulting, a solution the industry would not collectively embrace until 2015.

### B. FAILURE OF OTHERS

50.     The non-obviousness of the DigitalDoors Patents is confirmed by the demonstrated failure of the financial industry's leading institutions and experts to solve the problem of data survivability prior to the widespread adoption of the infringing technologies.

51.     This failure was objectively documented by the U.S. Department of the Treasury during the "Hamilton Series" cybersecurity simulations conducted between 2014 and 2016. These exercises, which involved the largest U.S. financial institutions and federal regulators, simulated catastrophic cyberattacks similar to the 2014 Sony Pictures breach.

52.     The Hamilton Series exercises concluded with a startling finding: under the industry's then-standard operating procedures, "all critical systems, including backups, failed." See "Sheltered Harbor Fact Sheet," January 2019. The sophisticated disaster recovery systems employed by the banks, systems that relied on replication and redundancy rather than the granular isolation taught by DigitalDoors, were proven insufficient to prevent a systemic collapse of public confidence.

53.     The fact that the entire U.S. financial sector, with its virtually unlimited resources, failed to implement a survivable backup architecture until compelled by the failure of the Hamilton Series exercises demonstrates that the inventions of the DigitalDoors Patents were not obvious to persons of ordinary skill in the art at the time of invention.

### C. INDUSTRY SKEPTICISM

54.     At the time of the invention in 2007, the concepts claimed in the DigitalDoors Patents were contrary to accepted wisdom in the IT and banking sectors, facing significant industry skepticism.

55.     The prevailing trend in 2007 was toward "hyper-connectivity" and "real-time replication" to minimize recovery times. The concept of "air-gapping" (physically or logically isolating) data was widely criticized by industry experts as obsolete, inefficient, and operationally impractical for high-speed financial transaction environments.

56.     Furthermore, the DigitalDoors concept of "granular extraction", the breaking down of files to secure specific semantic content (e.g., account balances) rather than backing up entire disk volumes, was skeptically viewed as computationally expensive and unnecessary compared to the "block-level" backup technologies dominating the market.

57.     The industry's subsequent U-turn in 2015, specifically the Sheltered Harbor mandate for "air-gapped," "immutable," and "granular" data vaults, vindicates the inventors' foresight and proves that they were proceeding in a direction the industry had skeptically rejected.

**D. COMMERCIAL SUCCESS AND INDUSTRY ADOPTION**

58.     The inventions claimed in the DigitalDoors Patents have achieved immense commercial success and industry-wide adoption, albeit often under the guise of "industry standards" such as Sheltered Harbor.

59.     Following the failure of traditional methods in the Hamilton Series, the financial industry established the Sheltered Harbor initiative to implement a "data vaulting" standard that mirrors the core teachings of the DigitalDoors Patents: the extraction of select content, its isolation in a secure, air-gapped vault, and its reconstruction using a standardized format.

60.     This infringing architecture has been overwhelmingly adopted. As of 2019, institutions participating in this standard held approximately 70% of U.S. deposit accounts and 55% of U.S. retail brokerage    client    assets.    See    Sheltered    Harbor    Fact    Sheet,

https://shelteredharbor.org/images/ShelteredHarbor/Documents/Sheltered-Harbor-Fact-Sheet-January-2019.pdf.

61.     Major technology vendors, including Defendant's service providers (e.g., Dell, FIS, Jack Henry), have developed and sold specific product lines (e.g., "PowerProtect Cyber Recovery," "SecurePort") expressly designed to implement these infringing functionalities, generating billions of dollars in revenue attributable to the features claimed in the DigitalDoors Patents.

### E. INDUSTRY PRAISE AND ACQUIESCENCE

62.     The systems and methods claimed by DigitalDoors have received high praise and official endorsement from the highest levels of the U.S. government and financial regulatory bodies.

63.     The Federal Financial Institutions Examination Council (FFIEC), the Office of the Comptroller of the Currency (OCC), and the FDIC have all issued guidance effectively mandating or strongly recommending the implementation of "data vaulting" and "Sheltered Harbor" resilience capabilities, capabilities that infringe the DigitalDoors Patents. See FFIEC Cybersecurity Resource Guide, https://www.ffiec.gov/sites/default/files/media/press-releases/2022/2022-cybersecurity-resource-guide-ffiec.pdf.

64.     This regulatory endorsement acts as objective evidence of the non-obviousness and utility of the inventions, confirming that the DigitalDoors architecture provides a unique and necessary solution to a critical national security problem.

### THE DIGITAL DOORS PATENTS ARE AN UNCONVENTIONALSOLUTION TO A TECHNOLOGICAL PROBLEM

65.     The DigitalDoors Patents each relate generally to unconventional methods and systems for organizing and processing data in a distributed system and, more particularly, those which extract specific sensitive content for specialized storage and subsequent reconstruction. *See, e.g.*, '301 Patent at Abstract and at 3:17-4:35.

66.    The claims of the DigitalDoors Patents have priority to at least January 5, 2007 (the "Date of Invention").  At that time, the practice of extracting specific content from structured and unstructured data for dedicated disaster recovery to achieve the advantages of the inventions claimed in the DigitalDoors Patents was still many years away.

67.    For example, as of the Date of Invention, the conventional approach focused on information recorded in structured data formats with little to no capacity to manage unstructured content. *See, e.g.*, '301 Patent at 1:31-38.

68.    Further, and as of the Date of Invention, it was necessary to classify sensitive data, but doing so was inefficient and inadequate because it did not employ semantic or taxonomic analyses.  *See id.* at 1:39-55.

69.    Beyond these issues, the state of the art as of the Date of Invention was for enterprises to operate open ecosystems which permitted employees, partners, customers, vendors, and others to participate in the production of information and the consumption of information. *See id.* at 1:60-2:3. Such open ecosystems were vulnerable because of the number of access points, thus necessitating robust information rights management functionality.  *See id.* at 2:3-27.

70.    Still further, as of the Date of Invention, enterprises were largely unable to effectively address the changing sensitivity value of information over the lifecycle of the information file.  *See id*. at 2:28-61.

71.    In view of the issues set forth in paragraphs 32-36, there was no convention approach to information management which automatically categorized information in unstructured information files and labeled such information in a way to enable the implementation of policies intended to ensure the proper handling, distribution, retainment, deletion, and management of the information.  *See id.*

13

72.    The inventions as described and claimed in the DigitalDoors Patents unconventionally shifted the management approach from data files to the content itself, thus achieving substantial advantages in enterprise information infrastructure management. *See, e.g., id.* at 9:46-58.

73.    Further evidence of the fact that the inventions as described and claimed in the DigitalDoors patents were unconventional is the known timeline and years-long collective effort on the part of the financial services industry to develop the infringing technologies.

74.    More specifically, the financial services industry did not even begin to develop a secure architecture which extracts specific sensitive content for specialized storage and subsequent reconstruction until 2015 as a response to growing cyber threats. *See, e.g.*, Joint White Paper authored by Dell and Sheltered Harbor entitled: A Sheltered Harbor in a Cyber Storm, available at https://shelteredharbor.org/index.php/about#press.

75.    The fact that the financial services community took several years to develop its own standard is strong evidence that the inventions as claimed in the DigitalDoors Patents were unconventional, and the fact that the industry did not begin its own development until 2015 is strong evidence that the technological solutions as claimed were unconventional as of the Date of Invention.

76.    For example, Dell did not fully develop its compliant Sheltered Harbor system until five years after the initialization of the Sheltered Harbor working group. *See, e.g.*, Dell Podcast EP032 (at 2:05-3:20 time mark), available at: www.spreaker.com/user/11960889/power2podcast-ep032 (hereafter "Dell Podcast").

77.    The fact that Dell spent five years developing its own compliant system is strong evidence that the technical solutions as described and claimed in the DigitalDoors Patents were unconventional and non-obvious as of the Date of Invention.

14

78.     Likewise, the fact that over 900 subject matter experts contributed to the Sheltered Harbor standard is strong evidence that the technical solutions as described and claimed in the DigitalDoors Patents were unconventional as of the Date of Invention.  *See, e.g.*, Cobalt Iron White Paper, entitled: Building Cyber Resilience to Maintain Public Confidence in the Financial Industry: Sheltered Harbor and Cobalt Iron, available at: https://shelteredharbor.org/images/ShelteredHarbor/Documents/CobaltIron-WhitePaper-SheltredHarbor-20220607_Final.pdf (hereafter "Cobalt Iron White Paper").

79.     Still further, the fact that the Sheltered Harbor solution is viewed within the technological community as a groundbreaking "blueprint for how modern cyber-protections should be designed and delivered, especially in a very vulnerable industry like financial services" (*see* Dell Podcast (at 4:00-4:25 time mark) is strong evidence that the technical solutions as described and claimed in the DigitalDoors Patents were unconventional as of the Date of Invention.  *See* also Cobalt Iron White Paper ("In fact, now that the financial industry has figured out how to respond to a catastrophic data event, Sheltered Harbor has formed key alliances to expedite your data vaulting progress").

80.     The deficiencies in the state of the art as of the Date of Invention were highly problematic, in as much as enterprises could not effectively manage sensitive data at the informational level.  *See, e.g.*, '301 Patent at 9:46-58.

81.     The inventions as claimed in the DigitalDoors Patents overcame the deficiencies in the art by offering the unconventional approach of implementing categorical filters, including content-based filters, contextual filters, and taxonomic filters, thus allowing substantial data security benefits.  As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance over the state of the art.

82.     In view of the deficiencies in the state of the art as of the Date of Invention, enterprises could not effectively extract specific content from structured and unstructured data. *See, e.g.*, '301 Patent at 1:31-38; 1:50-56; 2:54-61; and 19:53-55.

83.     The inventions as claimed in the DigitalDoors Patents overcame the deficiencies in the art by offering an unconventional taxonomic analysis, including tag placeholder substitution, thus allowing substantial data security benefits.  As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance over the state of the art.

84.     The deficiencies in the state of the art as of the Date of Invention were such that enterprises could not effectively control the security of their open information ecosystems. *See, e.g.*, '301 Patent at 2:3-27.

85.     The inventions as claimed in the DigitalDoors Patents overcame the deficiencies in the art by offering an unconventional architecture which includes an inference engine as a counterbalance, thus allowing substantial data security benefits. *See, e.g., id.* at 26:49-27:2. As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance over the state of the art.

86.     The deficiencies in the state of the art as of the Date of Invention were highly problematic, inasmuch as enterprises could not effectively address the changing sensitivity value of information over the lifecycle of the information file. *See id.* at 2:28-61 and 9:53-58.

87.     The inventions as claimed in the DigitalDoors Patents overcame the deficiencies in the art by offering an unconventional architecture which includes a life cycle engine, thus allowing substantial security management advantages over an extended period and in view of changing circumstances. *See, e.g., id.* at 26:49-27:2. As such, the technological solutions of the DigitalDoors Patents were not well-

16

understood, routine, or conventional as of January 2007, and provided greatly improved system performance over the state of the art.

88.    Conventional dispersal algorithms existing as of the Date of Invention did not allow for the mapped dispersal of information to secure and select storage. *See, e.g.*, '301 Patent at 15:23-39.

89.    The inventions as claimed in the DigitalDoors Patents overcame the deficiencies in the art by offering an unconventional architecture which includes the ability to disperse content of the whole data stream while maintaining access to the constituent parts of the content. *See id.* As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance over the state of the art.

90.    Conventional dispersal algorithms existing as of the Date of Invention did not allow for the use of granular data which is stored in a known and accessible storage. *See, e.g.*, '301 Patent at 15:43-58.

91.    The inventions as claimed in the DigitalDoors Patents overcame the deficiencies in the art by offering an unconventional architecture which reduces security risks by storing smaller and more granular pieces of data, and by modifying the conventional method of allowing access to data only when data is retrieved from a few stores and then combined together. *See id.* As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance over the state of the art.

92.    Conventional systems as of the Date of Invention did not provide a means for performing a first granular extract of data from the source, followed by the use of a dispersal algorithm to secure extracted granular pieces of data, one at a time. *See, e.g.*, '301 Patent at 15:63-16:24.

93.    The inventions as claimed in the DigitalDoors Patents overcame the deficiencies in the art by offering an unconventional architecture which "brings flexibility to the system as a whole since granular pieces can be reconstituted, one at a time, and released from [the information dispersal algorithm]

for knowledge management operations without compromising the security of the whole document." *See id.* As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance and security over the state of the art.

94.     Conventional systems as of the Date of Invention did not offer the security measures of the inventions as claimed. As described by the inventors: "By securing granular data pieces with the Information Dispersal Algorithm or IDA, the system's granular data parts once reconstituted by the IDA are available in system storage and are stand-alone data structures – (encrypted or not). These stand-alone data structures and the granular data therein can be read on their own without the need to bring together other data shares. Because extracts can be in plain text or decrypted – and stand in their own data structure, the sys-admin can authorize an advanced search and knowledge management operations through the granular data structure." *See* '301 Patent at 16:7-24.

95.     These security advances follow from the inventive architecture which, inter alia, incorporates filtered and distributed storage. These advantages are explained by the patentee, including as follows: "Distributed storage stores need less security than a centralized data repository for a number of reasons. First, the distributed storage stores hold only parts of the data and they are of lower interest to an attacker that will need to attack few dispersed stores to get the total content. Second, the stores are scattered and if hidden they call for less security. The need for less security means lower costs; more efficiency and less processing power. Thus, dispersal of data to distributed storage stores is inherently 'built in', 'baked in' security." *Id.* at 16:39-47. As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance and security over the state of the art.

18

96.     Conventional security protocols as of the Date of Invention were premised on designations permitting access to files beating specific classification labels. *See, e.g.,* '301 Patent at 99:34-65.

97.     The inventions as claimed in the DigitalDoors Patents overcame the deficiencies in the art by offering an unconventional approach which "uses a granular or filter approach to make secure the sensitive data in a particular document. [Select Content] labels, matching the relevancy of the [Select Content] data may be employed rather than security level tags." *Id.* As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance over the state of the art.

98.     The inventions as described and claimed in the DigitalDoors Patents specifically advance the art in unconventional ways, including but not limited to the following: "(a) To automatically control selection of data objects within a data stream and release them in a controlled method only to authorized parties; (b) To automatically separate data objects within a data stream into two or more digital data streams according to the importance and categorization of contents, through extraction and removal of the prioritized content and its replacement by appropriate placeholders; (c) To automatically control selected contents in E-mail, and enable its release in a controlled method only to authorized parties; (d) To enable users to leverage the growth in computer and telecommunications connectivity and electronic commerce by reducing security risks; (e) To enable users to release documents, digital files, and data streams into closed and opened digital networks with the confidence that important, identifying, and critical contents in that documents, digital files, and data streams is secure and will be seen only by authorized parties; (f) To enable real time simultaneous customization and personalization of selected contents within a data stream to different parties, allowing instant display of the selected content or part of it based on, and tailored made to the status of the user or receiving party; (g) To secure the important and critical contents of a document or digital file by transporting said contents into a separated data stream and removing said

19

data stream to a removed storage memory, while eradicating any copies, temporary caches, or traces of the removed extracts on the original computer or machine; (h) To enable instant return transfer to the display or to another display all or part of extracted content instantly with verification of authorized user; (i) To create a projection of the original document, digital file, data objects within a data stream, or variations of it through combined projection of the splinted data streams, while maintaining separation between the data streams; (j) To create an alternative method for security, instead of encryption, which is secure, cost effective, less time-consuming, and flexible; (k) To enable automatic timed removal of specific content items, automatically or manually selected from a document, digital file, or data objects within a data stream; [and] (l) To enable an automatic timed reconstruction (reconstitution) of the said document, digital file, or data objects within a data stream." *See, e.g.,* '301 Patent at 102:39-103:13.  As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance over the state of the art.

99.    The inventions as described and claimed in the DigitalDoors Patents specifically advance the art in unconventional ways, including but not limited to assigning different weights to individual granular content items.  *See, e.g.,* '301 Patent at 17:57-18:25. Such enhanced capacity to manipulate granular data unconventionally improved upon the performance and security of data management systems as of the Date of Invention.

100.    The inventions as described and claimed in the DigitalDoors Patents specifically advance the art in unconventional ways, including but not limited to improving upon the creation of "tear tagged lines" in the form of contextual ranges within a given data source. *See, e.g.,* '301 Patent at 19:8-49.

101.    The inventions unconventionally select ranges of contiguous content and apply an inference engine to assign different weights to different granular content items.  *Id.*  Such enhanced

20

capacity to manipulate granular data unconventionally improved upon the performance and security of data management systems as of the Date of Invention.

102.    The inventions as described and claimed in the DigitalDoors Patents specifically advance the art in unconventional ways, including but not limited to providing a system and method for controlled release of data and granular data streams after verification and validation before the release of each layer. *See, e.g.,* '301 Patent at 20:42-59.

103.    The inventions unconventionally reduce security risks by storing smaller and more granular pieces; attackers thus require access to multiple stores to piece together all the content.  Further, individual layers of data of the original document data stream may be released at once or at different times. *Id.*  Such enhanced capacity to manipulate granular data unconventionally improved upon the performance and security of data management systems as of the Date of Invention.

104.    The inventions as described and claimed in the DigitalDoors Patents specifically advance the art in unconventional ways, including but not limited to providing a system and method for flexible content access based on "rolling" granular data exposure with decryption for better workflow.  *See, e.g.,* '301 Patent at 21:45-67.

105.    The inventions unconventionally introduce "a solution based on creation of (1) granular pieces of data (2) a distributed storage framework as a way to deal with the need to encrypt yet not overwhelm the processing and other computing workflow.  The system creates granular data pieces out of the original document/data stream.  This is done through a process of content analysis, selection, extraction and dispersal to distributed storage." *Id.*  Such enhanced capacity to manipulate granular data unconventionally improved upon the performance and security of data management systems as of the Date of Invention.

106.    Conventional security protocols existing as of the Date of Invention were deficient in their inability to protect privacy and security. *See, e.g.,* '301 Patent at 26:49-27:2. The inventions as claimed in the DigitalDoors Patents overcame the deficiencies in the art by offering an unconventional approach "by controlling the access to sensitive content. The sensitive information is defined by the inference engine. Documents and data streams are filtered by the inference engine, granular data is selected, (and may be extracted to distributed stores). Granular pieces of data are released by a controlled mechanism to avoid security and privacy breaches." *Id.* As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance, and specifically improved security measures, over the state of the art.

107.    The deficiencies in the state of the art as of the Date of Invention were such that search results were imprecise and not comprehensive. *See, e.g.,* '301 Patent at 28:33-47. The inventions as claimed in the DigitalDoors Patents overcame the deficiencies in the art by offering an unconventional architecture which "establishes an interaction between distributed storage stores with data mining operations." *Id.* As such, and because "searching in different stores (each one with its own subject matter) results in more robust search results," the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance over the state of the art. *Id.*

108.    Conventional systems existing as of the Date of Invention failed to store different data extracts in one storage location. *See, e.g.,* '301 Patent at 28:51-29:14. The inventions as claimed in the DigitalDoors Patents overcame the deficiencies in the art by offering an unconventional approach which "stores extracts of a data stream in different memories within one storage location".

109.    There is a major difference between splitting a document or a data stream and placing its parts in one storage location and [the inventions as described], which deals with placing extracts of a document or a data stream in one storage location.

110.    "This invention deals in a situation that a whole data asset was already parsed – and split into a 'remainder' and 'extracts.'  What is transferred to one storage location is not all the pieces of a whole document or data assets but partial part of the whole the 'extracts.'"  *Id.*  As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance over the state of the art.

111.    The inventions of the DigitalDoors Patents unconventionally improve upon online data storage techniques existing as of the Date of invention.  As explained by the patentees: "The invention also proposes a new architecture for storage on the internet.  The invention enables a user to make as many copies as he wants of a document or data stream with minimal amount of security risk.  If a storage node is attacked a small granular piece will not pose a serious threat.  A small granular piece does not convey all the substance of the original document/data stream.  If the replicated piece is small enough the attacker will find it useless because it is out of context.  For example, a granular piece of data which is a name only can't create a serious threat because it is out of context.  Other stores need to be attacked successfully to access their data to give context to the small granular data piece.  The security risk of having many copies can be reduced by the user decreasing the size of the granular pieces and dispersing the different pieces to different distributed storage store."  *See* '301 Patent at 30:33-57.  As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance over the state of the art.

112.    The inventions of the DigitalDoors Patents unconventionally improved upon online data storage techniques existing as of the Date of invention by "deliver[ing] capabilities to transform order

within the data content into disorder making it very hard for an enemy to attack." *See* '301 Patent at 34:55-35:25. This approach moves away from traditional perimeter security and, as such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance over the state of the art. *Id.*

113.   The inventions of the DigitalDoors Patents unconventionally improved upon online data storage techniques existing as of the Date of invention by offering an architecture which "minimizes data."

114.   More specifically, the inventions "provide a system and method for flexible content access based on rolling granular data exposure with decryption for added security.  Granular pieces of the original document/data stream are dispersed to distributed storage nodes to enable a controlled secured environment for release of data.  The granular data layers can be exposed one at a time decrypted instead of exposure of a total document." *See* '301 Patent at 35:31-41.  As such, the technological solutions of the DigitalDoors Patents were not well-understood, routine, or conventional as of January 2007, and provided greatly improved system performance and security over the state of the art. *Id.*

115.   The inventions as described and claimed in the DigitalDoors Patents specifically advance the art in unconventional ways, including but not limited to "establishing a stronger multilevel security (or MLS) architecture and product, than is currently available." *See, e.g.,* '301 Patent at 98:65-99:14.  The inventions unconventionally "introduces multilevel security through sanitization of critical content of a source or plaintext document (or data object) with the unique ability to reconstruct all or part of the original document in conformance to the classification level of the user." *Id.*  Such enhanced capacity to manipulate granular data unconventionally improved upon the performance and security of data management systems as of the Date of Invention.

116.   The inventions as described and claimed in the DigitalDoors Patents specifically advance the art in unconventional ways, including but not limited to "resolving the major challenges facing

24

government in enabling sharing of information between its different organizations in relationship to conducting military operations as well as fighting terrorism." *See, e.g.*, '301 Patent at 100:41-67.

117.    The inventions unconventionally provide an architecture in which granular data is controlled based upon authorization.    Such enhanced capacity to manipulate granular data unconventionally improved upon the performance and security of data management systems as of the Date of Invention.

118.    The inventions as described and claimed in the DigitalDoors Patents specifically advance the art in unconventional ways, including but not limited to "avoiding any one point of failure." *See, e.g.*, '301 Patent at 101:53-102:29. The inventions unconventionally provide an architecture which includes the "creation of substantial lines of defense in depth.   The attacker will need to break through many obstacles before accessing all the dispersed data of the document." *Id.*   Such enhanced capacity to manipulate granular data unconventionally improved upon the performance and security of data management systems as of the Date of Invention.

119.    Core features of the inventions as described and claimed in the DigitalDoors Patents include extracting specific content from files, documents, and data objects and then dispersing both the extracted and remainder data separately in pieces to different storage locations. *See, e.g.,* '301 Patent at 16:25-38.   This new and inventive method of data extraction and distributed storage increased security because hackers would have to hack multiple locations without knowing where or what they were, or how to fit pieces together. *See, e.g.,* '301 Patent at 16:25-38; 48:56-67.   It also provided survivability, particularly when different copies of the same pieces were distributed in different locations, because a military strike would be unlikely to wipe out all the pieces of the data. *See, e.g.,* '301 Patent at 16:25-38.

120.    The claims of the DigitalDoors Patents are not drawn to laws of nature, natural phenomena, or abstract ideas.  Although the systems and methods claimed in the DigitalDoors Patents are known and

25

implemented now (and, as a result, are widely infringed), the specific combinations of elements and steps, as recited in the claims, were not conventional or routine as of the Date of Invention.

121.    The claims of the DigitalDoors Patents contain inventive concepts which transform any underlying non-abstract aspects of the claims into patent-eligible subject matter.

122.    Consequently, the claims of the DigitalDoors Patents recite methods resulting in improved functionality of the systems on which they are performed and represent technological improvements to the operation of computers as tools of trade.

123.    The foregoing facts establish a basis to find that the claims of the DigitalDoors Patents were unconventional and non-abstract as of the Date of Invention.

## DIGITALDOORS PATENTS ARE PATENT-ELIGIBLE NOT ABSRACT

124.    The DigitalDoors Patents are not directed to abstract ideas. They recite specific data-processing architectures that modify how computers store, isolate, and reconstruct information, yielding measurable improvements in system resilience, security, and recovery performance.

125.    The claims do not merely apply generic computer components but instead define non-routine and non-conventional arrangements that were not well-understood, routine, or conventional at the time of invention.

126.    To date, DigitalDoors has successfully defeated every motion seeking to dismiss its patent infringement complaints for failure to establish that the DigitalDoors Patents are directed to and claim patentable subject matter.

127.    This includes motions filed in the following cases in the U.S. District Court for the Northern District of Georgia: *DigitalDoors, Inc. v. Ameris Bank*, 1:24-cv-05576-VMC (ECF No. 23); *DigitalDoors, Inc. v. Colony Bank*, 1:24-cv-05578-VMC (ECF No. 16); DigitalDoors*, Inc. v. RBC Bank (Georgia)*, 1:24-cv-05580-VMC (ECF No. 27); *DigitalDoors, Inc. v. Servisfirst Bancshares, Inc.*, 1:24-

cv-05583-VMC (ECF No. 25); and *DigitalDoors, Inc. v. Southstate Bank*, 1:24-cv-05585-VMC (ECF No. 21).

128.    This includes motions filed in the following cases in the U.S. District Court for the Eastern District of Texas: *DigitalDoors, Inc. v. Comerica Bank*, 2:23-cv-541-JRG-RSP (ECF No. 77) on a motion by *First Citizens Bank & Trust Company*; and consolidated case *DigitalDoors, Inc. v. Cathay Bank*, 2:24-cv-312-JRG-RSP (ECF Nos. 71, 72 and 73) on motions by Frost Bank, First Horizon Bank and Iberia Bank, and Cadence Bank, respectively.

### COMPLIANCE WITH BANKING REGULATIONS HAVE RESULTED IN USE OF TECHNOLOGIES THAT INFRINGE DIGITALDOORS PATENTS

129.    Federal regulations requiring U.S. financial institutions to take measures to ensure the resiliency and security of their data and operations have resulted in such institutions using technologies that infringe the claims of the DigitalDoors Patents.

130.    These regulations include 15 U.S.C. § 6801 provides:

a)    It is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information.

b)    In furtherance of the policy in subsection (a), each agency or authority described in section 6805(a) of this title . . . shall establish appropriate standards for the financial institutions subject to their jurisdiction . . .

(1) to insure the security and confidentiality of customer records and information;

(2) to protect against any anticipated threats or hazards to the security or integrity of such records; and

(3) to protect against unauthorized access to or use of such records or information which could result in substantial harm or inconvenience to any customer.

131.    These regulations also include 16 C.F.R. §§ 314.3 and 314.4 provide in part:

§ 314.3 - Standards for Safeguarding Customer Information

(a)    **Information security program.** You shall develop, implement, and maintain a comprehensive information security program that . . . shall include the elements set forth in § 314.4 and shall be reasonably designed to achieve the objectives of this part, as set forth in paragraph (b) of this section.

(b)    **Objectives.** The objectives of section 501(b) of the Act, and of this part, are to:

    (1) Insure the security and confidentiality of customer information;

    (2) Protect against any anticipated threats or hazards to the security or integrity of such information; and

    (3) Protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer.

§ 314.4 - Elements - In order to develop, implement, and maintain your information security program, you shall:

(b) Base your information security program on a risk assessment that identifies reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that could result in the unauthorized disclosure, misuse, alteration, destruction, or other compromise of such information, and assesses the sufficiency of any safeguards in place to control these risks.

    (1) The risk assessment shall be written and shall include:

        (ii) Criteria for the assessment of the confidentiality, integrity, and availability of your information systems and customer information, including the adequacy of the existing controls in the context of the identified risks or threats you face; and

        (iii) Requirements describing how identified risks will be mitigated or accepted based on the risk assessment and how the information security program will address the risks.

(c) Design and implement safeguards to control the risks you identify through risk assessment, including by:

    (2) Protect by encryption all customer information held or transmitted by you both in transit over external networks and at rest. . . .;

    (4) Adopt secure development practices for in-house developed applications utilized by you for transmitting, accessing, or storing customer information and procedures for evaluating, assessing, or testing the security of externally developed applications you utilize to transmit, access, or store customer information;

132.    These regulations also include 12 C.F.R. Appendix B to Part 364 – Interagency Guidelines

Establishing Information Security Standards that provide in part:

II. Standards for Safeguarding Customer Information

    A.    *Information Security Program.* Each insured depository institution shall implement a comprehensive written information security program that includes administrative, technical, and physical safeguards appropriate to the size and complexity of the institution and the nature and scope of its activities. While all parts of the institution are not required to implement a uniform set of policies, all elements of the information security program must be coordinated.

    B.    *Objectives.* An institution's information security program shall be designed to:

        1.    Ensure the security and confidentiality of customer information;

        2.    Protect against any anticipated threats or hazards to the security or integrity of such information;

        3.    Protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer; and
        4.    Ensure the proper disposal of customer information and consumer information.

III. Development and Implementation of Information Security Program

    A.    Involve the Board of Directors.

    B.    Assess Risk. Each bank shall:

        1.    Identify reasonably foreseeable internal and external threats that could result in unauthorized disclosure, misuse, alteration, or destruction of customer information or customer information systems.

        2.    Assess the likelihood and potential damage of these threats, taking into consideration the sensitivity of customer information.

        3.    Assess the sufficiency of policies, procedures, customer information systems, and other arrangements in place to control risks.

    C.    Manage and Control Risk. Each bank shall:

        1.    Design its information security program to control the identified risks, commensurate with the sensitivity of the information, as well as the complexity

29

and scope of the bank's activities. Each bank must consider whether the following security measures are appropriate for the bank and, if so, adopt those measures the bank concludes are appropriate...

133.    The guidelines include those set forth in the Federal Financial Institutions Examination Council ("FFIEC") Information Technology Examination Handbook, Business Continuity Management Handbook ("FFIEC BCM Handbook") https://ithandbook.ffiec.gov/media/2nifgh2b/ffiec_itbooklet_businesscontinuitymanagement_v3.pdfthat provide in part at pages 18 and 20-21, respectively:

> p. 18 - Resilience is "the ability to prepare for and adapt to changing conditions and withstand and recover rapidly from disruptions. Resilience includes the ability to withstand and recover from deliberate attacks, accidents, or naturally occurring threats or incidents . . .  Resilience extends beyond recovery capabilities to incorporate proactive measures for mitigating the risk of a disruptive event in the overall design of operations and processes. Resilience strategies, including maintaining security standards, should extend across the entire business, including outsourced activities."

> p. 18 - Management should evaluate whether there are appropriate resources to ensure resilience, including an accessible, off-site repository of software, configuration settings, and related documentation, appropriate backups of data, and off-site infrastructure to operate recovery systems. Furthermore, management should discuss potential disaster scenarios with the entity's third party service providers to prepare for an event. Subsequently, management should assess the entity's immediate or short-term space requirements, systems, and personnel capacity to assume or transfer failed operations. Additionally, management should assess critical third party service providers' susceptibility to simultaneous attacks and verify their resilience capabilities. Examiners should review the following: • Appropriateness of resilience practices, including the adequacy of recovery infrastructure and backup processes. • Integration with disaster recovery services to protect against data destruction. • Assessment of alternate data communications infrastructure between the entity and critical third-party service providers. • Evaluation of the entity's susceptibility to multiple threat scenarios in resilience planning, testing, and recovery strategies. • Designation of emergency personnel, including for critical business process-level employees.

> pp. 20-21 – Management should determine the appropriate retention periods for each iteration of data backup. Entities should safeguard against replicating malware and data corruption.

134.    The guidelines also include those set forth in the Interagency Guidance on Third-Party Relationships: Risk Management - A Notice by the Federal Reserve System, the Federal Deposit Insurance

Corporation, and the Comptroller of the Currency on June 9, 2023, https://www.fdic.gov/news/financial-institution-letters/2023/fil23029.html that provide in part that a financial institution's "use of third party technology does not remove the need for sound risk management. On the contrary, the use of third parties, especially those using new technologies, may present elevated risks to banking organizations and their customers, including operational, compliance, and strategic risks. Importantly, the use of third parties does not diminish or remove banking organizations' responsibilities to ensure that activities are performed in a safe and sound manner and in compliance with applicable laws and regulations . . ."

135.    Also, regulations 12 C.F.R. §§ 4.32 and 4.36 provide in part that records made by the Office of the Controller of the Currency ("OCC") - a constituent member of the FFIEC - in the performance of its responsibilities such as supervising, licensing, regulating, and examining a financial institution is non-public information that remains the property of the OCC and cannot be disclosed without the written permission of the OCC.

## COMPLIANCE WITH REGULATIONS

136.    According to the Securities and Exchange Commission, it is the responsibility of the Board of Directors to oversee cybersecurity safeguards and ensure the privacy and continuity of client data.  *See, e.g.,* Securities and Exchange Commission ("SEC") Compliance Guide entitled: Cybersecurity Risk Management, Strategy, Governance, and incident Disclosure, as modified September 5, 2023, available at: sec.gov/corpfin/secg-cybersecurity (hereafter as "SEC Article").

137.    SEC Regulation S-K Item 106 (17 CFR § 229.106) expressly requires the following from all registrants in their filings: "Describe the board of directors' oversight of risks from cybersecurity threats. If applicable, identify any board committee or subcommittee responsible for the oversight of risks from cybersecurity threats and describe the processes by which the board or such committee is informed about such risks."

138.    Moreover, Boards of Directors for financial institutions are responsible for safeguarding the customer data managed by the institution, including specifically all account data. *See, e.g.,* FDIC White Paper entitled: Statement Concerning the Responsibilities of Bank Directors and Officers, available at: fdic.gov/regulations/laws/rules/responsibilities-bank-directors-officers.pdf (Stating: "Directors and officers of banks have obligations to discharge duties owed to their institution and to the shareholders and creditors of their institutions, and to comply with federal and state statutes, rules and regulations. Similar to the responsibilities owed by directors and officers of all business corporations, these duties include the duties of loyalty and care").

139.    As an integral part of such responsible oversight of customer financial data, and pursuant to its fiduciary duties, Defendant (together with and through its Board of Directors) is required to implement systems (or the operational equivalent) to both its production and backup facilities. *See, e.g.,* FFIEC          BCM          Handbook,          available          at: https://ithandbook.ffiec.gov/media/2nifgh2b/ffiec_itbooklet_businesscontinuitymanagement_v3.pdf, at 19 and 21.

## THE ACCUSED INSTRUMENTALITIES

140.    Upon information and belief, Defendant uses software implemented on hardware to ensure the resiliency and security of its bank data and operations ("the Accused Instrumentalities") that infringe the DigitalDoors Patents. The specific details concerning the infringing Accused Instrumentalities as implemented by Defendant are uniquely known to Defendant and are beyond public view. Consequently, as permitted by law, DigitalDoors' pleading of facts in support of its infringement allegations upon information and belief is proper. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1330 (Fed. Cir. 2009)). As such, discovery is necessarily required prior to more specific identifications of the infringing systems.

141.    The Sheltered Harbor specification defines "critical account data" as the "select content" and utilizes specific data schemas (categorical filters) to isolate this data from the raw banking ledger.

142.    Upon information and belief, Defendant has deployed and utilizes a "Data Vaulting" and "Cyber Resilience" infrastructure that infringes the DigitalDoors Patents. Specifically, to comply with the FFIEC's requirements and/or to participate in the "Sheltered Harbor" initiative, Defendant utilizes systems provided by vendors such as Dell (PowerProtect Cyber Recovery), FIS (Data Restore), or Jack Henry (SecurePort), or a proprietary equivalent. These systems function by (a) filtering the Defendant's core banking data to identify "select content" (e.g., critical account balances) as recited in the '301 Patent; (b) extracting this content from the production environment; and (c) transmitting it to a physically and logically isolated "vault" (air-gapped storage) as recited in the '169 and '073 Patents. This architecture is distinct from traditional disaster recovery (which relies on synchronous replication) and specifically implements the "semantic disassembly" and "controlled reassembly" claimed by Plaintiff.

## COUNT I
## Infringement of U.S. Patent No. 9,015,301

143.    Plaintiff incorporates the above paragraphs by reference.

144.    Defendant has a core bank database which is periodically backed up.

145.    Defendant's core bank database is backed up in multiple locations.

146.    Defendant's core bank database is part of a distributed computing system.

147.    Defendant's core bank database has select content important to its enterprise, wherein the select content is represented by one or more predetermined words, characters, images, data elements or data objects.

148.    Defendant's select content is stored in a plurality of select content data stores.

149.    Defendant's content data stores are operative with a plurality of designated categorical filters.

33

150.    Defendant's content data stores are operatively coupled over a communications network.

151.    Defendant activates at least one designated categorical filter and processes a data input therethrough to obtain the select content and associated select content, which associated select content is at least one of contextually associated select content and taxonomically associated select content, as aggregated select content.

152.    On information and belief, Defendant stores the aggregated select content for the at least one categorical filter in the corresponding select content data store.

153.    On information and belief, Defendant, for the activated categorical filter, associates at least one data process from the group of data processes including a copy process, a data extract process, a data archive process, a data distribution process and a data destruction process.

154.    On information and belief, Defendant, applies the associated data process to a further data input based upon a result of the further data being processed by the activated categorical filter utilizing the aggregated select content data.

155.    On information and belief, activating the designated categorical filter encompasses a manual activation or an automatic activation which is time-based, distributed computer system condition-based, or event-based.Upon information and belief, Defendant owns and/or controls the operation and/or utilization of the Accused Instrumentalities and generates substantial financial revenues therefrom, including but not limited to revenues derived from consumer confidence in the Defendant's ability to protect against cyber threats and maintain operations regardless of external attack or internal system failure.

156.    Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claims 25 of the '301 Patent by using the Accused Instrumentalities.  The Accused

Instrumentalities themselves are specially configured by Defendant to directly perform, and do in fact directly perform, all infringing steps.

157.    Upon information and belief, the Accused Instrumentalities comprise an apparatus which comprises the claimed distributed computer system and/or computer readable medium, or directly performs the claimed method of organizing and processing data in a distributed computing system having select content important to an enterprise operating said distributed computing system and represented by one or more predetermined words, characters, images, data elements or data objects.  More specifically, the Accused Instrumentalities comprise a network of servers, hardware, and software for processing the core bank data, and vaulting such data in compliance with regulations and/or specifications or their operational equivalent, as described herein above.  The Defendant is the enterprise operating the distributed computing system, and uses the system, owns all data, and controls the data vault directly or through its agents and authorized designees.

158.    More specifically, upon information and belief, Defendant utilizes the Vanguard LoanVantage platform as a "Select Content Data Store" within this distributed system. Defendant activates categorical filters to identify "Select Content" (including commercial loan data, borrower Nonpublic Personal Information ("NPI"), and credit history) residing within the FIS Miser core system. This content is extracted from the core, aggregated with associated contextual metadata (such as borrower risk profiles), and stored in the distinct LoanVantage database for underwriting analysis, separate from the core ledger.

159.    Further, upon information and belief, Defendant utilizes the MANTL account opening platform as a "Categorical Filter" at the network edge. MANTL processes data input from online applicants, applying "contextual filters" (including fraud detection logic and Know Your Customer validation) and "taxonomic filters" (such as account type classification) to generate aggregated select

35

content. This content is then selectively extracted and "boarded" into the FIS Miser core, which acts as the corresponding data store.

160.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the claimed method of organizing and processing data in a distributed computing system having select content important to an enterprise operating the distributed computing system and represented by one or more predetermined words, characters, images, data elements or data objects.

161.    Upon Information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of providing, in the distributed computing system, a plurality of select content data stores operative with a plurality of designated categorical filters which stores are operatively coupled over a communications network.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a data vault with designated stores for designated select content, as derived from categorical filters.

162.    Upon Information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of providing, in the distributed computing system, a plurality of select content data stores operative with a plurality of designated categorical filters which stores are operatively coupled over a communications network.

163.    Upon Information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of activating at least one of the designated categorical filters and processing a data input therethrough to obtain the select content and associated select content, which associated select content is at least one of contextually associated select content and taxonomically associated select content, as aggregated select content.  More specifically, and on information and belief,

and as discussed herein above and below, the Accused Instrumentalities comprise a system in which protection policies are implemented using aggregated tags.

164.    Upon Information and belief, Defendant uses a system in which the plurality of designated categorical filters are activated in order to obtain (extract) select content for protective vaulting in designated storage.

165.    Upon Information and belief, as implemented, the extracted information is either contextually or taxonomically associated.  As explained by the inventors: "A simple classification system (hierarchical taxonomic system) can be established by reviewing the label descriptions on the structured data and then expanding class definitions with the use of the Knowledge Expander (KE) search engine. […] The hierarchical taxonomic system can be used to build contextual filters and taxonomic filters which can further protect Sec-Con data and expand the value and quantity of SC data." *See* '301 Patent at 10:22-32.  Defendant's systems allow for the grouping of tags using metadata or any of a number of functionally equivalent means of achieving the same result; namely, the filtering of data for inclusion in designated storage.  By way of example, virtual machine tags are created in the enable the enterprise to attach metadata to virtual inventory assets, making them easier to sort and search.  Tags are grouped within categories, which can further include specific object types.  use of tag grouping, including by the use of metadata, is an implementation of contextually or taxonomically associated data.

166.    Upon Information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of activating at least one of the designated categorical filters and processing a data input therethrough to obtain the select content and associated select content, which associated select content is at least one of contextually associated select content and taxonomically associated select content, as aggregated select content.

37

167.    Upon Information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of storing the aggregated select content for the at least one categorical filter in the corresponding select content data store.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which the data storage vault stores select content for a designated set of account data, which includes binaries and backups.

168.    Upon Information and belief, Defendant uses systems in which the plurality of designated categorical filters are activated in order to obtain (extract) select content for protective vaulting.  Such vaulting places aggregated select content into corresponding data vaults, to back up critical customer account data.  The data vault is encrypted, unchangeable, and completely separated from Defendant's infrastructure, including all backups. The system permits the platform to recover data from the vault to restore customer funds access as quickly as possible.

169.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of storing the aggregated select content for the at least one categorical filter in the corresponding select content data store.

170.    Upon Information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of, and for the activated categorical filter, associating at least one data process from the group of data processes including a copy process, a data extract process, a data archive process, a data distribution process and a data destruction process.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which the data storage vault associates specific actions to specific data types such that the data is copied, archived, extracted, or distributed in accordance with the policies of the enterprise.

171.    Upon Information and belief, Defendant uses systems in which the plurality of designated categorical filters are activated in order to obtain (extract) select content for protective vaulting. Such filtering associates data processes, which include at least one of the following: (i) a copy process (which is linked to a copy data store); (ii) a data extract process (which is linked to an extract store); (iii) a data archive process (which is linked to an archive data store); (iv) a data distribution process (linked to a distribution security level for the select content); and/or (v) a data destruction process. The system associates certain data processes with certain select content in order to copy the data to the vault or other data store, extract the data to the vault or other data store, archive the data, or apply distribution controls on the data in accordance with clearance policies.

172.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of, and for the activated categorical filter, associating at least one data process from the group of data processes including a copy process, a data extract process, a data archive process, a data distribution process and a data destruction process.

173.    Upon Information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of applying the associated data process to a further data input based upon a result of the further data being processed by the activated categorical filter utilizing the aggregated select content data.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which the data storage vault associates specific actions to specific data types such that the data is copied, archived, extracted, or distributed in accordance with the policies of the enterprise.

174.    Upon Information and belief, the plurality of designated categorical filters are activated in order to obtain (extract) select content for protective vaulting.  Such filtering associates data processes, which include at least one of the following: (i) a copy process (which is linked to a copy data store); (ii) a

data extract process (which is linked to an extract store); (iii) a data archive process (which is linked to an archive data store); (iv) a data distribution process (linked to a distribution security level for the select content); and/or (v) a data destruction process.  associate certain data processes with certain select content in order to copy the data to the vault or other data store, extract the data to the vault or other data store, archive the data or apply distribution controls on the data in accordance with clearance policies.  As implemented, enterprises establish policies which are applied by the compliant to manage data backup and vaulting.

175.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of applying the associated data process to a further data input based upon a result of the further data being processed by the activated categorical filter utilizing the aggregated select content data.

176.    Upon Information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of activating a designated categorical filter, which encompasses an automatic activation or a manual activation and the automatic activation is time-based, distributed computer system condition-based, or event-based.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which the data storage vault associates specific actions to specific data types such that the data is copied, archived, extracted, or distributed in accordance with the policies of the enterprise.

177.    Upon Information and belief, the Accused Instrumentalities use a plurality of designated categorical filters activated in order to obtain (extract) select content for protective vaulting.  Such filtering associates data processes, which include at least one of the following: (i) a copy process (which is linked to a copy data store); (ii) a data extract process (which is linked to an extract store); (iii) a data archive process (which is linked to an archive data store); (iv) a data distribution process (linked to a distribution

40

security level for the select content); and/or (v) a data destruction process. The data vault is encrypted, unchangeable, and completely separated from the institution's infrastructure, including all backups.

178.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of activating a designated categorical filter, which encompasses an automatic activation or a manual activation and the automatic activation is time-based, distributed computer system condition-based, or event-based.

179.    Upon information and belief, in addition to Claim 25 of the '301 Patent, Defendant is also infringing Claims 1, 10, 16, 17, 21, 23, 24, 25, 27, 28, 30, 32, 34, 39, 40, 42, 43, 44, 45, 48, 57, 58, 63, 64, 67, 70, 71, 73, 74, 76, 77, 86, 87, 92, 93, 94, 96, 99, 101, 110, 111, 113, 115, 116, 117, 118, 120, 121, 122, and 123 of the '301 Patent.

180.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiff.  The amount of damages adequate to compensate DigitalDoors for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '301 Patent.

181.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '301 Patent, i.e., after service of the Complaint, such infringement is necessarily willful and deliberate.

182.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## COUNT II
## Infringement of U.S. Patent No. 9,734,169

183.    Plaintiff incorporates the above paragraphs by reference.

184.    Upon information and belief, Defendant's data vaulting implementation utilizes a private cloud, hybrid cloud, or distributed server architecture that meets the "cloud-based" limitation of the claim, as modern banking systems are inherently distributed across multiple data centers.

185.    Defendant, its agents, or authorized functionaries organize and process Defendant's data in a distributed cloud-based computing system having select content represented by one or more predetermined words, characters, images, data elements or data objects.

186.    Defendant, its agents, or authorized functionaries provide in its distributed cloud-based computing system a plurality of select content (SC) data stores for respective ones of a plurality of security (SEC) designated data, each SC data store having respective access controls threat.

187.    Defendant, its agents, or authorized functionaries provide in its distributed cloud-based computing system a plurality of granular data stores.

188.    Defendant, its agents, or authorized functionaries provide in its distributed cloud-based computing system a cloud-based server.

189.    Defendant, its agents, or authorized functionaries provide a communications network operatively coupling the plurality of SC data stores and cloud-based server.

190.    Defendant, its agents, or authorized functionaries extract and store the SEC designated data in respective SC data stores.

191.    On information and belief, Defendant, its agents, or authorized functionaries activate at least one of the SC data stores in the cloud-based computing system thereby permitting access to the SC data stores and respective SEC designated data based upon an application of one or more of the access controls threat.

192.    On information and belief, Defendant, its agents, or authorized functionaries parse remainder data not extracted from data processed by the cloud-based system and store the parsed data in respective granular data stores.

193.    On information and belief the remainder data includes randomly parsed and stored remainder data.

194.    On information and belief the remainder data includes remainder data pared according to a predetermined algorithm based upon the SEC designated data and the SC data stores.

195.    On information and belief the, some or all of the SEC designated data and the parsed data from the respective data stores is withdrawn only in the presence of the respective access controls applied thereto.

196.    Upon information and belief, Defendant owns and/or controls the operation and/or utilization of the Accused Instrumentalities and generates substantial financial revenues therefrom, including but not limited to revenues derived from consumer confidence in the Defendant's ability to protect against cyber threats and maintain operations regardless of external attack or internal system failure.

197.    Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 1 of the '169 Patent by using the Accused Instrumentalities.  The Accused Instrumentalities themselves are specially configured by Defendant to directly perform, and do in fact directly perform, all infringing steps.

198.    Upon information and belief, the Accused Instrumentalities comprise an apparatus which directly performs the claimed method of organizing and processing data in a distributed cloud-based computing system having select content represented by one or more predetermined words, characters, images, data elements or data objects.  More specifically, the Accused Instrumentalities comprise a cloud-

43

based network of servers, hardware, and software for processing data and vaulting such data. The
Defendant is the enterprise operating the distributed computing system, and uses the system, owns all
data, and controls the data vault.

199.    Specifically, upon information and belief, Defendant utilizes a Virtual Desktop
Infrastructure (VMware Horizon) which operates as the claimed distributed computing system. In this
system, the "desktop" presented to the user does not exist as a static file on the endpoint device. Rather, it
is dynamically generated by a "Reconstruction Module" (the Virtual Desktop Infrastructure ("VDI")
Agent) which combines "Security Designated Data" (the user's profile and permissions) with "Granular
Data" (including the authentic OS Image and Application Stacks) stored in the server cloud.

200.    In this implementation, the granular data stores (containing the OS images and application
binaries) are activated only upon the user's authenticated request. The system withdraws the parsed data
(the desktop components) and reconstructs the visual presentation for the user. When the session ends, the
presentation is deconstructed, and the data remains secured in the granular stores, creating the "formless"
security architecture taught by the '169 Patent.

201.    Upon information and belief, the systems used by Defendant are cloud-based.

202.    Upon information and belief, Defendant uses systems which manage and protect content
containing sensitive customer financial account data to promote the stability of the U.S. financial markets
by protecting critical account information and data sets of market participants in order to facilitate the
recovery and use of such information following a destructive cyberattack or other extreme loss of
operational capability.

203.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus
comprise an apparatus which directly performs the claimed method of organizing and processing data in

44

a distributed cloud-based computing system having select content represented by one or more predetermined words, characters, images, data elements or data objects.

204.    Upon information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of providing in the distributed cloud-based computing system: (i) a plurality of select content data stores for respective ones of a plurality of security designated data; and (ii) a plurality of granular data stores; and (iii) a cloud-based server, each select content data store having respective access controls thereat.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a data vault with designated stores for designated select content, as derived from categorical filters.

205.    Upon information and belief, the Accused Instrumentalities comprise an apparatus which directly performs the step of providing in the distributed cloud-based computing system: (i) a plurality of select content data stores for respective ones of a plurality of security designated data; and (ii) a plurality of granular data stores; and (iii) a cloud-based server, each select content data store having respective access controls thereat.

206.    Upon information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of providing a communications network operatively coupling the plurality of select content data stores and cloud-based server.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a distributed, cloud-based system which is configured to manage and protect data containing sensitive content.

207.    Upon information and belief, the Accused Instrumentalities comprise an apparatus which directly performs the step of (with respect to data processed by the cloud-based system) extracting and storing the security designated data in respective select content data stores.  More specifically, and on

45

information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which protection policies are implemented using aggregated tags.

208.    Upon information and belief, the plurality of designated categorical filters are activated in order to obtain (extract) select content for protective vaulting.

209.    Upon Information and belief, the extracted information is either contextually or taxonomically associated. As explained by the inventors: "A simple classification system (hierarchical taxonomic system) can be established by reviewing the label descriptions on the structured data and then expanding class definitions with the use of the Knowledge Expander (KE) search engine. […]  The hierarchical taxonomic system can be used to build contextual filters and taxonomic filters which can further protect Sec-Con data and expand the value and quantity of SC data." *See* '301 Patent at 10:22-32. systems allow for the grouping of tags using metadata or any of a number of functionally equivalent means of achieving the same result; namely, the filtering of data for inclusion in designated storage.  virtual machine tags are created enable the enterprise to attach metadata to virtual inventory assets, making them easier to sort and search.  Tags are grouped within categories, which can further include specific object types.  The use of tag grouping, including by the use of metadata, is an implementation of contextually or taxonomically associated data.

210.    Upon information and belief, in the Accused Instrumentalities a plurality of designated categorical filters are activated in order to obtain (extract) select content for protective vaulting. Such vaulting places aggregated select content into respective corresponding data stores.

211.    Upon information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of (with respect to data processed by the cloud-based system) extracting and storing the security designated data in respective select content data stores.

212.    Upon information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of activating at least one of the select content data stores in the cloud-based computing system thereby permitting access to the select content data stores and respective security designated data based upon an application of one or more of the access controls threat.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which the data storage vault is safeguarded by a number of security measures, including strict credential-controlled access.

213.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of activating at least one of the select content data stores in the cloud-based computing system thereby permitting access to the select content data stores and respective security designated data based upon an application of one or more of the access controls threat.

214.    Upon information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of parsing remainder data not extracted from data processed by the cloud-based system and storing the parsed data in respective granular data stores.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which non-extracted data is stored on the production side (i.e., outside the data vault) in a plurality of data stores.

215.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of parsing remainder data not extracted from data processed by the cloud-based system and storing the parsed data in respective granular data stores.

216.    Upon information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of (with respect to the aforementioned parsing and storing of remainder data) including both (i) randomly parsing and storing the remainder data, and (ii) parsing and storing the

remainder data according to a predetermined algorithm based upon the security designated data and the select content data stores. More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which data encryption methodologies are implemented across the production environment and the data vault.

217. Upon information and belief, the Accused Instrumentalities further comprise a plurality of designated categorical filters are activated in order to obtain (extract) select content for protective vaulting.

218. In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of parsing remainder data not extracted from data processed by the cloud-based system and storing the parsed data in respective granular data stores.

219. Upon information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of withdrawing some or all of the security designated data and the parsed data from the respective data stores only in the presence of the respective access controls applied thereto. More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which strict access control measures are implemented to safeguard the data vault and allow for secure restoration.

220. In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of withdrawing some or all of the security designated data and the parsed data from the respective data stores only in the presence of the respective access controls applied thereto.

221. The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiff. The amount of damages adequate to compensate DigitalDoors for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '169 Patent.

222.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '169 Patent, i.e., after service of the Complaint, such infringement is necessarily willful and deliberate.

223.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

### COUNT III
### Infringement of U.S. Patent No. 10,182,073

224.    Plaintiff incorporates the above paragraphs by reference.

225.    Defendant, its agents, or authorized functionaries create an information infrastructure for processing data throughput in a distributed computing system with respective ones of a plurality of filters.

226.    Defendant, its agents, or authorized functionaries identify sensitive content and select content in the data throughput with respective initially configured filters of the plurality of filters.

227.    On information and belief, Defendant, its agents, or authorized functionaries represent sensitive content by one or more sensitive words, characters, images, data elements or data objects therein grouped into a plurality of sensitivity levels, the select content represented by one or more predetermined words, characters, images, data elements or data objects.

228.    On information and belief, Defendant, its agents, or authorized functionaries provide a plurality of secure sensitive content data stores and a plurality of select content data stores for the respective initial filters, in the distributed computing system.

229.    On information and belief, Defendant, its agents, or authorized functionaries operatively couple the respective initially configured filters, over a communications network with the distributed computing system, the plurality of sensitive content data stores and the select content data stores.

230.    On information and belief, Defendant, its agents, or authorized functionaries alter the respective initially configured filters by expanding one or both of the sensitive content and the select content in a designated filter.

231.    On information and belief, Defendant, its agents, or authorized functionaries alter the respective initially configured filters contracting or reducing one or both of the sensitive content and the select content in the designated filter.

232.    On information and belief, Defendant, its agents, or authorized functionaries alter the respective initially configured filters by imposing or removing a hierarchical or an orthogonal classification in the designated filter.

233.    On information and belief, Defendant, its agents, or authorized functionaries generate modified configured filters based upon the alterations with the designated filter.

234.    On information and belief, Defendant, its agents, or authorized functionaries organize further data throughput in the distributed computing system with the modified configured filters.

235.    Upon information and belief, Defendant owns and/or controls the operation and/or utilization of the Accused Instrumentalities and generates substantial financial revenues therefrom, including but not limited to revenues derived from consumer confidence in the Defendant's ability to protect against cyber threats and maintain operations regardless of external attack or internal system failure.

236.    Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 1 of the '073 Patent by using the Accused Instrumentalities. The Accused Instrumentalities themselves are specially configured by Defendant to directly perform, and do in fact directly perform, all infringing steps.

50

237.    Upon information and belief, the Accused Instrumentalities comprise an apparatus which directly performs the claimed method of creating an information infrastructure for processing data throughput in a distributed computing system with respective ones of a plurality of filters.  More specifically, the Accused Instrumentalities comprise a network of servers, hardware, and software for processing data and vaulting such data The Defendant is the "enterprise operating the distributed computing system," and Defendant itself makes and uses the system, owns all data, and controls the data vault.

238.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the claimed method of creating an information infrastructure for processing data throughput in a distributed computing system with respective ones of a plurality of filters.

239.    The Accused Instrumentalities further comprise an apparatus which directly performs the step of identifying sensitive content and select content in the data throughput with respective initially configured filters of the plurality of filters, the sensitive content represented by one or more sensitive words, characters, images, data elements or data objects therein grouped into a plurality of sensitivity levels, the select content represented by one or more predetermined words, characters, images, data elements or data objects.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a data vault with designated stores for designated select content, as derived from categorical filters.

240.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the claimed step of identifying sensitive content and select content in the data throughput with respective initially configured filters of the plurality of filters, the sensitive content represented by one or more sensitive words, characters, images, data elements or data

objects therein grouped into a plurality of sensitivity levels, the select content represented by one or more predetermined words, characters, images, data elements or data objects.

241.    The Accused Instrumentalities further comprise an apparatus which directly performs the step of providing in the distributed computing system a plurality of secure sensitive content data stores and a plurality of select content data stores for the respective initial filters.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a data vault with designated stores for designated select content, as derived from categorical filters.

242.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of providing in the distributed computing system a plurality of secure sensitive content data stores and a plurality of select content data stores for the respective initial filters.

243.    Upon information and belief, the Accused Instrumentalities comprise an apparatus which directly performs the step of operatively coupling the respective initially configured filters, over a communications network with the distributed computing system, the plurality of sensitive content data stores and the select content data stores.

244.    The Accused Instrumentalities further comprise an apparatus which directly performs the step of altering the respective initially configured filters by: expanding one or both of the sensitive content and the select content in a designated filter, contracting or reducing one or both of the sensitive content and the select content in the designated filter, and imposing or removing a hierarchical or an orthogonal classification in the designated filter.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which protection policies are implemented using aggregated tags, and such tags (and their respective policies) are enabled for modification (expansion and contraction) by the operating enterprise.

245.     In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of altering the respective initially configured filters by: expanding one or both of the sensitive content and the select content in a designated filter, contracting or reducing one or both of the sensitive content and the select content in the designated filter, and imposing or removing a hierarchical or an orthogonal classification in the designated filter.

246.     Upon information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the steps of generating modified configured filters based upon the alterations with the designated filter; and organizing further data throughput in the distributed computing system with the modified configured filters.   More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise in which protection policies are implemented using aggregated tags, and such tags (and their respective policies) are enabled for modification (expansion and contraction) by the operating enterprise.   Such modification is dynamic and the resulting parameters are thereafter implemented by the system.

247.     In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the steps of generating modified configured filters based upon the alterations with the designated filter; and organizing further data throughput in the distributed computing system with the modified configured filters.

248.     Upon information and belief, in addition to Claim 1 of the '073 Patent, Defendant is also infringing Claims 8, 11, 16, 18, and 20 of the '073 Patent.

249.     The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiff.   The amount of damages adequate to compensate DigitalDoors for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '073 Patent.

250.     To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '073 Patent, i.e., after service of the Complaint, such infringement is necessarily willful and deliberate.

251.     Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## COUNT IV
## Infringement of U.S. Patent No. 10,250,639

252.     Plaintiff incorporates the above paragraphs by reference.

253.     Defendant, its agents, or authorized functionaries process data throughput in an information infrastructure in a distributed computing system with respective ones of a plurality of filters.

254.     On information and belief, Defendant, its agents, or authorized functionaries identify sensitive content or select content in the data throughput with one or more of the plurality of filters, the sensitive content represented by one or more sensitive words, characters, images, data elements or data objects therein grouped into a plurality of sensitivity levels, the select content represented by one or more predetermined words, characters, images, data elements or data objects.

255.     On information and belief, Defendant, its agents, or authorized functionaries extract and store the sensitive content from the data throughput in respective data stores based upon the plurality of sensitivity levels.

256.     On information and belief, Defendant, its agents, or authorized functionaries classify both the extracted sensitive content and the select content with a taxonomic category filter and generating classification tags therefor.

257.     On information and belief, Defendant, its agents, or authorized functionaries associate respective classification tags to the classified extracted sensitive content and the select content.

258.    On information and belief, Defendant, its agents, or authorized functionaries use the classification tags for data processing the stored sensitive content and the select content with a data mining process.

259.    On information and belief, Defendant, its agents, or authorized functionaries use the classification tags for data processing the stored sensitive content and the select content with a copy process.

260.    On information and belief, Defendant, its agents, or authorized functionaries use the classification tags for data processing the stored sensitive content and the select content with a transfer process to other predetermined storage stores.

261.    On information and belief, Defendant, its agents, or authorized functionaries use the classification tags for data processing the stored sensitive content and the select content with a supplemental data search process.

262.    On information and belief, Defendant, its agents, or authorized functionaries use the classification tags for data processing the stored sensitive content and the select content with a presentation process responsive to a data inquiry.

263.    On information and belief, Defendant, its agents, or authorized functionaries use the classification tags for data processing the stored sensitive content and the select content with use the classification tags in a structured data format for the transfer process and data storage.

264.    On information and belief, Defendant, its agents, or authorized functionaries use the classification tags for data processing the stored sensitive content and the select content with repeating the extraction and storage on further data throughput.

265.    Upon information and belief, Defendant owns and/or controls the operation and/or utilization of the Accused Instrumentalities and generates substantial financial revenues therefrom,

including but not limited to revenues attributable to revenues derived from consumer confidence in the Defendant's ability to protect against cyber threats and maintain operations regardless of external attack or internal system failure.

266.     Upon information and belief, Defendant has directly infringed and continues to directly infringe at least Claim 16 of the '639 Patent by using the Accused Instrumentalities. The Accused Instrumentalities themselves are specially configured by Defendant to directly perform, and do in fact directly perform, all infringing steps.

267.     Upon information and belief, the Accused Instrumentalities comprise an apparatus which directly performs the claimed method of sanitizing data processed in a distributed computing system having sensitive content and select content, the sensitive content represented by one or more sensitive words, characters, images, data elements or data objects therein, the sensitive content having a plurality of sensitivity levels, each sensitivity level having an associated security clearance, the select content represented by one or more predetermined words, characters, images, data elements or data objects, the distributed computing system having a plurality of extract data stores for respective ones of the plurality of sensitivity levels and having a plurality of select content data stores, the plurality of extract data stores and the select content data stores operatively coupled over a communications network.

268.     More specifically, upon information and belief, Defendant utilizes secure email gateway technologies (such as Zix/OpenText or Cisco Secure Email) to process data flow exiting the enterprise. These systems utilize filters to identify "Sensitive Content" (e.g., Social Security Numbers, account files) within the data throughput (e.g., outbound emails).

269.     Upon identification of Sensitive Content, the Accused Instrumentalities perform a "Sanitization" step by extracting the sensitive attachment or text from the email body. The system generates a "Placeholder" (typically a notification URL or HTML link) which is inserted into the

remainder data (the non-sensitive email body). The extracted sensitive content is encrypted and stored in a separate, secure web portal (a "Secure Extract Store"), while the sanitized email containing only the placeholder is transmitted to the recipient.

270.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the claimed method of sanitizing data processed in a distributed computing system having sensitive content and select content, the sensitive content represented by one or more sensitive words, characters, images, data elements or data objects therein, the sensitive content having a plurality of sensitivity levels, each sensitivity level having an associated security clearance, the select content represented by one or more predetermined words, characters, images, data elements or data objects, the distributed computing system having a plurality of extract data stores for respective ones of the plurality of sensitivity levels and having a plurality of select content data stores, the plurality of extract data stores and the select content data stores operatively coupled over a communications network.

271.    Upon information and belief, the Accused Instrumentalities comprise an apparatus which directly performs the step of extracting the sensitive content from a data input to obtain extracted sensitive data for a corresponding sensitivity level and remainder data. More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which protection policies are implemented using aggregated tags.

272.    Upon information and belief, the Accused Instrumentalities use categorical filters to filter data for inclusion in designated storage.

273.    In view of the foregoing, and on information and belief, the Accused Instrumentalities extract sensitive content from a data input to obtain extracted sensitive data for a corresponding sensitivity level and remainder data.

274.    Upon information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of storing the extracted sensitive data for the corresponding sensitivity level in a respective secure extract store in the distributed computer system.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which the data storage vault stores select content for a designated set of account data, which includes binaries and backups.

275.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of storing the extracted sensitive data for the corresponding sensitivity level in a respective secure extract store in the distributed computer system.

276.    Upon information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of extracting the select content from either the data input or the remainder data and storing extracted select content in the select content data stores.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which extracted select data is stored in the secure data vault, while non-extracted data is stored on the production side (*i.e.,* outside the data vault) in a plurality of data stores.

277.    Upon information and belief, the Accused Instrumentalities activates the plurality of designated categorical filters in order to obtain (extract) select content for protective vaulting.

278.    Upon information and belief, the Accused Instrumentalities further comprise an apparatus which directly results in the creation of sanitized sensitive content data and select content data from the non-extracted data from the select content extraction and remainder data from the sensitive content extraction.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which sensitive account data is extracted for secure storage in a data vault, thereby creating sanitized storage versions of the data.

58

279.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of parsing remainder data not extracted from data processed by the cloud-based system and storing the parsed data in respective granular data stores.

280.    Upon information and belief, the Accused Instrumentalities further comprise an apparatus which directly performs the step of inferencing the sanitized sensitive content data and select content data with (a) a content filter, (b) a contextual filter, and (c) a taxonomic filter; and obtaining an inferenced sensitive content data and an inferenced select content data therefrom.  More specifically, and on information and belief, and as discussed herein above and below, the Accused Instrumentalities comprise a system in which filters are utilized for the inferencing of content.

281.    In view of the foregoing, and on information and belief, the Accused Instrumentalities thus comprise an apparatus which directly performs the step of inferencing the sanitized sensitive content data and select content data with (a) a content filter, (b) a contextual filter, and (c) a taxonomic filter; and obtaining an inferenced sensitive content data and an inferenced select content data therefrom.

282.    Upon information and belief, in addition to Claim 16 of the '639 Patent, Defendant is also infringing Claims 1, 2, 3, 4, 6, 7, 11, and 12 of the '639 Patent.

283.    The foregoing infringement on the part of Defendant has caused past and ongoing injury to Plaintiff.  The amount of damages adequate to compensate DigitalDoors for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '639 Patent.

284.    To the extent Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '639 Patent, i.e., after service of the Complaint, such infringement is necessarily willful and deliberate.

285.    Each of Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, DigitalDoors, Inc. respectfully requests the Court enter judgment against Defendant as follows:

1.    Declaring that Defendant has infringed the Asserted Patent(s);

2.    Awarding DigitalDoors, Inc. its damages suffered because of Defendant's infringement of the Asserted Patent(s);

3.    Awarding DigitalDoors, Inc. its costs, reasonable attorneys' fees, expenses, and interest;

4.    Granting a permanent injunction pursuant to 35 U.S.C. § 283, enjoining Defendants from further acts of infringement with respect to the Asserted Patent(s);

5.    Awarding DigitalDoors, Inc. ongoing post-trial royalties for infringement of the non-expired Asserted Patent(s); and

6.    Granting DigitalDoors, Inc. such further relief as the Court finds appropriate.

## JURY DEMAND

Plaintiff DigitalDoors, Inc. respectfully demands trial by jury, under Fed. R. Civ. P. 38.

Dated: February 1, 2026

Respectfully Submitted,

*/s/ Jean-Marc Zimmerman*
Jean-Marc Zimmerman
**LUCOSKY BROOKMAN, LLP**
101 Wood Avenue South
Woodbridge, New Jersey 08830
E: jmzimmerman@lucbro.com
T: (908) 768-6408

**-AND-**

*/s/ Steven M. Hoffberg*
Steven M. Hoffberg
**HOFFBERG & ASSOCIATES**
29 Buckout Road
West Harrison, NY 10604
E: steve@hoffberglaw.com
T: (914) 949-2300

**ATTORNEYS FOR PLAINTIFF**